**FILED**
3-15-10
MAR 15 2010  NF
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

AO 91 (REV.5/85) Criminal Complaint

AUSAs Julie B. Porter, John R. Hauser, and Matthew Burke, (312) 886-1317

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MIGUEL ECHEVARRIA

MAGISTRATE JUDGE COLE

**CRIMINAL COMPLAINT**

CASE NUMBER: 10 CR 0201

**UNDER SEAL**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: On or about January 28, 2009, at Dundee, in the Northern District of Illinois, Eastern Division, MIGUEL ECHEVARRIA, defendant herein:

knowingly made a false statement and representation with respect to the information required by federal law to be kept in the records of a person licensed to deal in firearms under federal law, namely his statement, on an ATF Form 4473, that he was the "actual buyer" of a firearm, namely, an Uzi Model B rifle bearing serial number SA 42359, whereas, in truth and fact, as defendant knew, he was not the actual buyer, but was making a straw purchase of this firearm on behalf of another person;

in violation of Title 18, United States Code, Section 924(a)(1)(A). I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit, which is attached hereto and incorporated herein.

Signature of Complainant
MICHAEL P. MANGAN
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

March 15, 2010
Date

at Chicago, Illinois
City and State

Jeffrey Cole, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

| | |
|---|---|
| UNITED STATES DISTRICT COURT | ) |
| | ) ss |
| NORTHERN DISTRICT OF ILLINOIS | ) |

## AFFIDAVIT

I, MICHAEL P. MANGAN, being duly sworn, state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed for over eight years. Currently, I am assigned to the FBI's Eurasian Organized Crime ("EOC") Squad, which specializes in investigating federal crimes committed by Chicago-area European organized crime groups. Prior to my assignment to the FBI's EOC squad, I worked approximately four years on an organized crime squad in Detroit, specializing primarily in the investigations of La Cosa Nostra and Middle Eastern criminal enterprises, as well as one year investigating violent crime matters. Prior to my assignment with the FBI, I was a police officer in Illinois for over nine years.

2. This affidavit is submitted in support of a criminal complaint alleging that MIGUEL ECHEVARRIA has violated Title 18, United States Code, Section 924(a)(1)(A). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging a January 28, 2009 violation of Title 18, United States Code, Section 924(a)(1)(A), I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint. Where statements of others are set forth in this Affidavit, they are

1

set forth in substance and in part and are not verbatim. All dates and times set forth below are approximate. Statements from recorded conversations do not include all statements or topics covered during the course of the recorded conversations, and are not taken from a final transcript.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, a cooperating witness who has proved to be reliable, consensually recorded conversations, surveillance, and documents.

## FACTS SUPPORTING PROBABLE CAUSE

### A. Background Concerning CW#1 and ECHEVARRIA

4. In February 2008, a Cooperating Witness ("CW#1") was charged with financial crimes and has since been indicted. Before that indictment, CW#1 had been arrested for an ordinance violation by the Chicago Police Department, but was not charged. CW#1 has no known criminal history. At this time, no promises have been made to CW#1, nor have any agreements been reached with CW#1, by either the FBI or the U.S. Attorney's Office regarding what sentence CW#1 may receive for his/her participation in criminal activity, or what charges will be filed against CW#1 by the United States for his/her criminal conduct. CW#1 has agreed to cooperate because CW#1 has been informed that the extent and nature of his/her cooperation will be made known to the judge who will sentence CW#1, and that CW#1's cooperation will also be considered by the United States Attorney's Office in its decision as to what charges to file against CW#1 for his/her involvement in criminal

conduct. Information provided by CW#1 in this investigation has been corroborated by agent surveillance, consensual recordings, and information provided by other confidential sources.

5. In March 2008, I interviewed CW#1. CW#1 told me that before his/her cooperation, he/she had purchased a Glock pistol with laser sights from an individual named "Mike," whom CW#1 recalled was a prison guard. I showed CW#1 a driver's license photograph of MIGUEL ECHEVARRIA. CW#1 positively identified ECHEVARRIA as the "Mike" who sold CW#1 the pistol. CW#1 described the gun purchase in more detail. ECHEVARRIA invited CW#1 to ECHEVARRIA's residence; at the residence, ECHEVARRIA laid out multiple firearms on a bed. ECHEVARRIA showed CW#1, among other weapons, a 12-gauge shotgun, a nine-millimeter handgun, a Glock with laser sights, and a green assault rifle with a scope. CW#1 told me that ECHEVARRIA sold CW#1 the Glock for $1,200.

6. I know from ECHEVARRIA's statements in recorded conversations, records filled out by ECHEVARRIA, and identification that ECHEVARRIA provided to a gun store that he is a Correctional Officer and Deputy Sheriff for the Office of the Cook County Sheriff.

7. Based on my training and experience, I know the following:

    a. Federally licensed firearms dealers were required to record all sales of firearms on Bureau of Alcohol, Tobacco, and Firearms ("ATF") Forms 4473, unless the sales were to other licensed dealers.

3

    b. A person purchasing a firearm was required to provide certain accurate information on an ATF Form 4473, including his or her name, address, and other identifying information, and was also required to state truthfully whether he or she was the actual buyer of the firearm.

    c. Federally licensed firearms dealers used the information provided on ATF Forms 4473 to insure that the buyers were not prohibited by law from purchasing firearms. Law enforcement agencies used the information provided on ATF Forms 4473 to trace firearms used in crimes and for other purposes.

    d. A "straw purchase" was an illegal purchase of a firearm for another person, in which the purchaser falsely stated on the ATF Form 4473 that he or she was the actual buyer of the firearm.

**B. ECHEVARRIA's Purchase of AR-15 Rifle for CW#1**

    8. On January 13, 2009, at approximately 2:32 p.m., CW#1 received a telephone call from ECHEVARRIA, which was consensually recorded.[1] In the conversation, CW#1 told ECEHVARRIA that he/she had called ECHEVARRIA yesterday to go to the store and get "that." [I understand CW#1 to be referring to a gun.] ECHEVARRIA told CW#1, "Let's make it Thursday" [January 15th]. ECHEVARRIA said words to the effect of, "You want it with all the toys and whistles? With that hundred round thing? And the laser

---

[1] All of CW#1's phone calls described in this affidavit were to or from phone number 773-875-XXXX. According to T-Mobile USA records, that phone number was subscribed to ECHEVARRIA.

and everything?" When CW#1 responded affirmatively, ECHEVARRIA said that CW#1 should bring about "two" [which I understand to mean two thousand dollars], and said that CW#1 would have to wait 24 hours for the weapon.

9. On January 15, 2009, I provided CW#1 with cash and recording devices. CW#1 then met with ECHEVARRIA and recorded the discussion. In the late afternoon of January 15, 2009, CW#1 picked up ECHEVARRIA in CW#1's vehicle in Chicago; CW#1 and ECHEVARRIA drove together to a suburban gun store. ECHEVARRIA told CW#1 that he had called four [gun] dealers. ECHEVARRIA told CW#1, "Now when we go up there [to the gun store], you're gonna hand me the money before we go in there." CW#1 replied that he/she understood because "people be like, what the fuck is going on?" ECHEVARRIA responded, "Exactly." ECHEVARRIA told CW#1, "He's [the gun dealer] got one or two AR's [AR-15 rifles] left, so we gotta get over there, we gotta get it, and, you know, you gotta wait 24 hours." ECHEVARRIA told CW#1 that in addition to the rifle, ECHEVARRIA would also buy the magazines, the ammunition, and the laser sight. I know from my training and experience that magazines are devices that can be attached to a rifle to store rounds of ammunition, which are extracted from the magazine and inserted into the firing chamber of a rifle after a round is fired, and a laser sight is a light that is placed on a handgun or a rifle and aligned to emit a laser beam parallel to the weapon's barrel.

10. A short time later, CW#1 told ECHEVARRIA that he was so sick that he had a fever of 104.5. ECHEVARRIA asked CW#1, "you know what that comes

from?" ECHEVARRIA then sniffed three times. CW#1 responded, "Oh, it's cocaine, yeah, I just had some bad fucking coke, man." CW#1 told ECHEVARRIA that CW#1 had blood dripping from his/her nose.[2] As they neared the gun store, CW#1 told ECHEVARRIA, "let me give you the money before we go in, man." ECHEVARRIA told CW#1, "Oh yeah, that's, without a question." CW#1 parked and then said, "You said 2,000, right?" ECHEVARRIA said, "Yeah," and "I'm gonna just pay for the rifle here." CW#1 counted out the money to give to ECHEVARRIA. Just after that, CW#1 and ECHEVARRIA agreed to enter the gun store together. ECHEVARRIA instructed CW#1, "Be very cool."

11. An agent, who was conducting surveillance during the recording, entered the store. The agent saw ECHEVARRIA talking to a clerk and filling out paperwork for a gun purchase.

12. I have since obtained the ATF Form 4473 that ECHEVARRIA filled out at the gun store on January 15, 2009, concerning his purchase of the AR-15 rifle. One question on the form asks, "Are you the actual transferee/buyer of the firearm listed on this form?" The form continues in bold writing: **"Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you."** ECHEVARRIA answered the question, "Yes." ECHEVARRIA signed the form. ECHEVARRIA also filled out and signed a form provided by the gun store, in which he was asked his occupation and, "What is the

---

[2] At agents' direction, CW#1 told ECHEVARRIA in this conversation and others described in this affidavit that he was a cocaine user.

purpose of this purchase." ECHEVARRIA answered that he was a Sheriff Deputy, and that the purpose of the purchase was "Target/Duty" [which I understand to mean, for target practice and for ECHEVARRIA's use in his job as a Sheriff Deputy].

13. On the ride back from the gun store, CW#1 told ECHEVARRIA that CW#1 was interested in purchasing an Uzi with a silencer. ECHEVARRIA replied, "You want an Uzi, I'll find it, but it's gonna, I'm telling you, you're gonna shit in your pants when I come at you and ask you for $3,000." CW#1 said, "I gotta have something with silencer, dude... it's not many guns you can just do that." ECHEVARRIA spoke with someone on his cell phone, and then said to CW#1, "He's got some ammo over there... real butch shit, it's called Penetrator. It's the type'a ammo that you don't fuck around with.... that's the shit you want." ECHEVARRIA made another call, in which he told a gun-store employee that he wanted to pick up the laser for the "AR" [which I understand to mean the AR-15 rifle ECHEVARRIA had just ordered for CW#1]. ECHEVARRIA also said to the store employee, "I'm picking that up . . .and probably 200 rounds of the Penetrator." ECHEVARRIA then told CW#1 that he would need more money, and CW#1 agreed to provide ECHEVARRIA an additional $400.

14. Near the end of the recorded conversation on January 15, 2009, ECHEVARRIA said, "brother, don't fucking waste this on anything. Nobody knows, OK?.. What I just got you would get me in a lotta mothafucking trouble, I mean a lot." CW#1 and ECHEVARRIA agreed to meet again. CW#1 said, "I gotta give you $400, hold on.... Almost

7

forgot that." CW#1 then said, "here's four."

15. On January 16, 2009, CW#1 met with ECHEVARRIA and consensually recorded the discussion. ECHEVARRIA told CW#1 that he had picked up various accessories for CW#1's gun, and that he was working on finding an Uzi for CW#1. ECHEVARRIA then picked up the AR-15 rifle, and told CW#1 that he would take it home to prepare it with the laser and other accessories.

16. On January 17, 2009, at approximately 12:02 p.m., CW#1 received a call from ECHEVARRIA, which was consensually recorded. ECHEVARRIA said it [the AR-15 rifle] "came out gorgeous" and that he was "cleaning it up real nice."

17. On January 17, 2009, I provided CW#1 with cash and recording devices. CW#1 met with ECHEVARRIA and consensually recorded the discussion. When I reviewed the video of the recording, I recognized ECHEVARRIA as the person who met with CW#1. ECHEVARRIA put a carrying case for the rifle into the open trunk of CW#1's vehicle. Among other things, ECHEVARRIA told CW#1 that he included a 100-round drum and four magazines with the rifle, and extra batteries for the laser sight. ECHEVARRIA showed CW#1 how to use the laser sight. CW#1 paid ECHEVARRIA $600 as a fee for obtaining the AR-15 rifle for CW#1. CW#1 counted out the money, saying, "One, two, three, four, five, six, right here." ECHEVARRIA said, "OK." CW#1 and ECHEVARRIA agreed to talk again about CW#1's interest in purchasing an Uzi.

18. Shortly after the January 17, 2009 recorded meeting between CW#1

8

and ECHEVARRIA, I met with CW#1. From CW#1's vehicle, I took the rifle and other items that CW#1 obtained from ECHEVARRIA. The rifle was a semiautomatic model LAR-15 rifle, bearing serial number KT 1026215. It was equipped with a laser sight. CW#1 gave me a drum, which was loaded with 100 rounds of .223 caliber rifle ammunition. I know from my training and experience that a drum is a device similar to a magazine in that it can be attached to a rifle to store rounds of ammunition, which are extracted from the drum and inserted into the firing chamber of the rifle; a drum can typically hold more rounds of ammunition than a magazine. CW#1 also gave me a carrying case for the rifle, four rifle magazines, a clear plastic bag containing 192 rounds of .223 caliber rifle ammunition, and a box containing 50 rounds of nine millimeter pistol ammunition, all of which CW#1 obtained from ECHEVARRIA.

C.  **ECHEVARRIA's Purchase of an Uzi Rifle for CW#1**

19.  On January 24, 2009, at approximately 12:54 p.m., CW#1 placed a recorded telephone call to ECHEVARRIA. CW#1 told ECHEVARRIA that he/she now has money for the Uzi. ECHEVARRIA said he will find out if the Uzi is available and, if it is, he and CW#1 will go get it. CW#1 told ECHEVARRIA that he/she loves "this one" (the AR-15 rifle), and ECHEVARRIA said he figured that CW#1 would.

20.  On or about January 26, 2009, at approximately 5:51 p.m., ECHEVARRIA called CW#1, and the conversation was recorded. ECHEVARRIA told CW#1 to start putting the money together, and that it is a "done deal" (meaning that the Uzi

if he/she had to "shoot somebody with it." CW#1 asked ECHEVARRIA if ECHEVARRIA could "get rid of it." ECHEVARRIA replied, three times, "Yeah." ECHEVARRIA then said, "Hopefully..." CW#1 said, "Uh, no, that's, that's not really what I'm... that's not what I wanna do, but just uh, you never know. So I'm not gonna let nobody... walk over me for no reasons and shit like that." ECHEVARRIA replied, "No. ...we keep it between us."

23. When they arrived at the gun store parking lot, CW#1 counted out $3,000 for ECHEVARRIA, and said, "that should be three right there." CW#1 asked ECHEVARRIA to count the money. After he had counted it, ECHEVARRIA said, "Got it."

24. I was conducting surveillance during the recording. I saw ECHEVARRIA go inside the gun store alone while CW#1 waited in his/her vehicle. Another agent entered the gun store and observed ECHEVARRIA filling out paperwork near a cash register.

25. At approximately 6:14 p.m., about twenty minutes after ECHEVARRIA went into the store, CW#1 received a phone call from ECHEVARRIA. ECHEVARRIA said words to the effect of, "Hey buddy, I'm almost done. They're just mounting the laser on it for me right now." ECHEVARRIA told CW#1 to meet him in the gun store in about ten minutes. CW#1 went into the gun store about ten minutes after the phone call. In the store, ECHEVARRIA handed CW#1 the box containing the Uzi. CW#1 went outside and examined the Uzi in the vehicle.

26. A short time later, ECHEVARRIA joined CW#1 in the vehicle. In

the vehicle, CW#1 told ECHEVARRIA that the Uzi was "awesome." ECHEVARRIA told CW#1 that he would put a collapsible stock on it. From my training and experience, I know this means that ECHEVARRIA was offering to alter the Uzi so that it could be made shorter. ECHEVARRIA agreed to bring magazines and bullets to CW#1 for the Uzi. CW#1 paid ECHEVARRIA another $300. At approximately 7:19 p.m., CW#1 and ECHEVARRIA arrived at a residence in Chicago where ECHEVARRIA asked to be dropped off. ECHEVARRIA told CW#1, "Put that bitch [the Uzi] back in that box. A'right, I'm a cop and I pull you over and I see that, it's over with."

27. Shortly after the January 28 recorded meeting between CW#1 and ECHEVARRIA, I met with CW#1. From CW#1's vehicle, I retrieved the Uzi, and other items CW#1 obtained from ECHEVARRIA. The Uzi is a Model B, bearing serial number SA 42359. The words, "Phila PA" are engraved on the gun. I also retrieved two 25-round magazines and a laser sight, which was attached to the rifle.

28. I have since obtained the ATF Form 4473 that ECHEVARRIA filled out at the Dundee, Illinois gun store on January 28, 2009, in connection with the purchase of the Uzi rifle. A question on the form asks, "Are you the actual transferee/buyer of the firearm listed on this form?" The form continues in bold writing: **"Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you."** ECHEVARRIA answered the question, "Yes." ECHEVARRIA signed the form.

ECHEVARRIA also filled out and signed a form provided by the gun store, in which he was asked his occupation and, "What is the purpose of this purchase." ECHEVARRIA answered that he was a Deputy Sheriff, and that the purpose of the purchase was "collection."

29. On or about February 12, 2009, at approximately 3:27 p.m., CW#1 received a phone call from ECHEVARRIA, and the call was recorded. ECHEVARRIA told CW#1 that "they," referring to police, "recovered a Model B with a silencer on it." ECHEVARRIA wanted to know if CW#1 still had the Uzi rifle that ECHEVARRIA purchased for and sold to CW#1. When CW#1 said that he/she still had the gun, ECHEVARRIA said, "Ok, 'cause I started having a fucking heart attack.... They recovered it in a deal and, God, right away my heart started pounding." CW#1 repeated that the recovered gun was not CW#1's.

## CONCLUSION

30. Thus, there is probable cause to believe that on or about January 28, 2009, MIGUEL ECHEVARRIA knowingly made a false statement and representation with respect to the information required by federal law to be kept in the records of a person licensed to deal in firearms under federal law, namely his statement, on an ATF Form 4473, that he was the "actual buyer" of a firearm, namely, an Uzi Model B rifle bearing serial number SA 42359, whereas, in truth and fact, as defendant MIGUEL ECHEVARRIA knew, he was not the actual buyer, but was making a straw purchase of this firearm on behalf of another person, in violation of Title 18, United States Code, Section 924(a)(1)(A).

FURTHER AFFIANT SAYETH NOT.

*[signature]*
MICHAEL P. MANGAN
Special Agent, Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on March 15, 2010.

*[signature]*
Jeffrey Cole
United States Magistrate Judge